# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | | |
|---|---|---|
| Jesse Andrade, as Personal Representative | ) | |
| of the ESTATE OF NICOLAS MORALES, | ) | |
| deceased, and on behalf of Nicolas | ) | |
| Morales' minor son, Nicolas Morales Jr., | ) | |
|     Plaintiff, | ) | Case No. 22-cv-482 |
| | ) | |
| v. | ) | |
| | ) | |
| COLLIER COUNTY SHERIFF KEVIN | ) | |
| RAMBOSK, in his official capacity on behalf of | ) | JURY DEMAND |
| COLLIER COUNTY, FLORIDA, as well as | ) | |
| COLLIER COUNTY SHERIFF'S OFFICERS | ) | |
| PIERRE JEAN, NATHAN KIRK and | ) | |
| and BRIAN TARAZONA, in their individual | ) | |
| capacities, | ) | |
|     Defendants. | ) | |

## <u>CIVIL RIGHTS COMPLAINT FOR DAMAGES</u>

Plaintiff Jesse Andrade, Personal Representative of the Estate of Nicolas Morales, on behalf of Mr. Morales' minor son, Nicolas Morales Jr. ("Nick Jr."), complains against Collier County Sheriff Kevin Rambosk, in his official capacity on behalf of Collier County, Florida, and Collier County Sheriff's Officers Pierre Jean, Nathan Kirk, and Brian Tarazona, in their individual capacities, as follows:

## INTRODUCTION

1.    On September 17, 2020, Collier County Sheriff's Office (CCSO) officers shot and killed Nicolas Morales, a father and migrant farmworker who was in the middle of a mental health crisis and who was not threatening anyone.

2.    The night Mr. Morales was killed, Defendant Officers Pierre Jean, Nathan Kirk, and Brian Tarazona responded to a 911 call from Immokalee, Florida indicating that a Mexican male was holding a shovel, knocking on the door of a neighbor's house, and asking to be let inside. Within 21 seconds of the Officers' arrival at the scene, Defendant Officer Jean cornered Mr. Morales and shot at him four times, hitting him three times in his body.

3.    Defendant Officer Kirk then sicced his K-9 German Shepherd on Mr. Morales. The dog latched onto Mr. Morales' body as he screamed in pain and threw up from the trauma.  All three Officers failed to provide timely medical care to Mr. Morales, who died from his injuries, leaving his son, Nick Jr., an orphan.

4.    At no time during this horrific incident did the Defendant Officers attempt to de-escalate the situation or use less-lethal force on Mr. Morales, who was in obvious mental distress, never acted aggressively toward the Officers, and posed no threat. Instead, the Defendant Officers used precipitous and unreasonable deadly force, and failed to intervene to prevent Mr. Morales' entirely preventable death. Their actions violated the U.S. Constitution and Florida state law, as well as the CCSO's own policies.

5.      Subsequent CCSO investigations of the Morales shooting were a sham, designed to clear the officers from criminal and administrative liability.

6.      Despite clear evidence that the Officers used excessive force, the CCSO criminal investigation ended with no charges, after investigators failed to even interview the perpetrators—Defendant Officers Jean, Kirk, or Tarazona. The Collier County State Attorney's Office, relying on that faulty criminal investigation, declined to press any charges against the Officers.

7.      CCSO's administrative investigation, intended to evaluate the Officers' compliance with CCSO policy, was equally flawed.  It resulted in the full exoneration of each Defendant Officer even though investigators did not interview any civilian witnesses or consider whether the Officers violated key CCSO policies governing use of force, de-escalation, or responding to persons with mental health issues. Investigators elicited only evidence to justify the shooting and mauling of Mr. Morales.

8.      The Defendant Officers' violent acts and the CCSO's perfunctory investigations in the Morales case were not anomalies but part of a larger pattern of excessive force and failed accountability in the CCSO. Under Sheriff Rambosk's leadership and the command of top-level CCSO officials, the CCSO intentionally fails to investigate its officers' use of excessive force against civilians—including beatings, tasings, dog attacks, and shootings—or hold officers accountable for

such misconduct. As a result, CCSO officials come to believe they can harm civilians with impunity. And they do so.

9.     The Estate of Nicolas Morales, by Jesse Andrade, brings suit to seek justice for Mr. Morales and for his young son, who has suffered immense trauma and pain in the wake of his father's death. Plaintiff seeks to shed light on the custom of unlawful force and failed accountability that has pervaded the CCSO for years and to stop the ceaseless abuse and killing of people in Collier County.

## JURISDICTION AND VENUE

10.     This case arises under the United States Constitution and the laws of the State of Florida. The Court has subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343(a), and over his state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b), as the events giving rise to the claims occurred in this judicial district.

## PARTIES

12.     NICOLAS MORALES, the decedent, was a 37-year-old man who was born in Mexico and resided in Immokalee, Florida, in Collier County, at the time of his death. While he was suffering a mental health crisis and presenting no threat to any person, Mr. Morales was shot and killed because of the acts and omissions of Defendants Jean, Tarazona, Kirk, and Collier County, through Sheriff Rambosk. Mr. Morales is survived by his son, Nick Jr.

13.    PLAINTIFF ESTATE OF NICOLAS MORALES, by personal representative JESSE ANDRADE, Mr. Morales' stepson, brings suit on behalf of Nicolas Morales Jr. ("Nick Jr."), the decedent's 13-year-old son. Jesse Andrade has been appointed Personal Representative of Nicolas Morales' estate.

14.    DEFENDANT OFFICERS PIERRE JEAN, NATHAN KIRK, and BRIAN TARAZONA were at all relevant times law enforcement officers duly appointed and employed as such with the CCSO.  As such, they were acting under color of state law at the time of the events giving rise to this action. They are sued in their individual capacities for compensatory and punitive damages under federal and state law.

15.    DEFENDANT COLLIER COUNTY SHERIFF KEVIN RAMBOSK is, and was at all times relevant to this action, the Sheriff of Collier County, Florida. At all times relevant hereto, Kevin Rambosk was acting under color of state law as the agency head of the CCSO. He is sued in his official capacity on behalf of COLLIER COUNTY, FLORIDA for compensatory damages under federal and state law.

## FACTUAL ALLEGATIONS IN SUPPORT OF CLAIMS

### THE DEFENDANT OFFICERS CORNERED, SHOT, ABUSED, AND ULTIMATELY KILLED MR. MORALES WITHOUT JUSTIFICATION

16.    On September 17, 2020, at approximately 1:12 a.m., a resident of Immokalee, Florida—in the area known as Farmworkers Village—placed an

emergency call, claiming that a "Mexican" or "Mexicano" male with a shovel was banging on her door and asking to be let in. The caller, speaking to the 911 dispatcher in both English and Spanish, knew the man as her next door neighbor.

17.    The subject of the 911 call was 37-year-old Nicolas Morales. Mr. Morales was a farm worker who lived in Immokalee and was a single father to then 12-year-old Nick Jr. Mr. Morales was a Spanish-speaker who was born in an indigenous Nahuatl community in Hidalgo, Mexico. At the time of his death, Mr. Morales was 5'4'' and weighed approximately 149 pounds.

18.    Mr. Morales had resided in Immokalee and Farmworkers Village in Collier County, Florida, for over 12 years. He split his time working in fields and packing houses when he was not caring for his young son, Nick Jr.

19.    Collier County, Florida, is home to approximately 380,000 residents, over 89% of whom are white. Only 33.7% of the population speaks a language other than English at home and less than 10% of the population lives below the poverty line. About 25% of Collier County residents were born outside of the United States.

20.    Immokalee is an unincorporated community in Collier County, Florida. The community is home to roughly 25,000 residents, many of them farmworkers.

21.    According to the 2020 U.S. Census, in stark contrast to the rest of Collier County, more than 70% of Immokalee residents are Hispanic or Latino,

41% were born outside of the United States, 79% speak a language other than English at home (63% speak Spanish and many residents speak one of several indigenous languages), and 32% live below the poverty line.

22.    Earlier on the night of September 17, 2020, Mr. Morales and his son, Nick Jr., had dinner and went to bed at around 9 p.m. At about midnight, Mr. Morales woke up Nick Jr. and told him that he was seeing spirits and creatures, and that the house was poisoned. Mr. Morales was in the midst of a mental health crisis. Mr. Morales left the house through a back window, shirtless and barefoot, to find help.

23.    At 1:12 a.m., Defendant Officers Jean, Kirk, and Tarazona were dispatched to the scene of the 911 call. Jean arrived at approximately 1:17 a.m. Kirk and Tarazona arrived seconds later in separate vehicles.

24.    Kirk, a K-9 officer, brought a German Shepherd K-9 to the scene.

25.    The Defendant Officers had been informed by dispatch that a "Hispanic male" was knocking on the front door of the caller's home, holding a shovel, and yelling to be let inside. There was no other crime reported.

26.    When the Officers arrived, they saw Mr. Morales was holding a gardening shovel. He was walking around the 911 caller's driveway, clearly disoriented and confused, obviously distressed, shirtless, and barefoot. There was substantial space between Mr. Morales and the Officers upon their arrival.

27.     It was late at night and there were no civilians at the scene. Mr. Morales was small in stature and did not have a knife or gun in his possession. He was not suspected of having committed a violent crime or felony, and the Defendant Officers had no reason to believe he would be armed and dangerous.

28.     The Officers did not investigate or speak to the 911 caller after they arrived. They did not conduct a background check on Mr. Morales or ask Mr. Morales questions about what was happening or why he was in distress. Had they done so, they would have learned that he was not dangerous or trying to break into the home of his neighbor—whom he knew personally—but that he was in a mental health crisis and seeking help.

29.     Instead, Defendant Jean—a 6-foot-tall, estimated 250-pound army veteran and former football player—exited his vehicle, immediately drew his pistol, and aimed it at Mr. Morales. Rather than keeping his distance and assessing the scene, Jean rapidly approached Mr. Morales. He did not identify himself or tell Mr. Morales that he was under arrest. He instead yelled in English, "hey don't come over here," and "get on the ground."

30.     As Jean closed in on Mr. Morales with his firearm drawn, Tarazona also exited his vehicle. Before he even saw Mr. Morales, Tarazona drew his own pistol and ran at Mr. Morales from the right of Jean. Kirk also exited his vehicle and rushed onto the scene, pulled forward by a lunging K-9 German Shepherd.

31.    Like Jean, Tarazona and Kirk encountered a small, partially undressed Mexican man walking around confused and holding gardening tools. Tarazona and Kirk were able to observe Jean yelling in English and charging forward with his gun pointed directly at Mr. Morales. They were close enough to easily communicate with Jean and they had the opportunity to de-escalate the situation, including by encouraging Jean to back up, slow down, and disarm.

32.    Neither tried to reel in Jean. Instead, all three cornered Mr. Morales with their weapons pointed at him, simultaneously yelling varied commands in English.

33.    Mr. Morales did not understand the commands. Upon information and belief, based on their training and prior law enforcement work in the County, and because the 911 caller and dispatch both identified Mr. Morales as a Mexican and Hispanic male, respectively, the Defendant Officers had strong reason to believe Mr. Morales might not understand English. Mr. Morales was also obviously confused by the Officers' commands. Yet at no time prior to shooting did the Officers issue any instructions or commands in Spanish, even though, on information and belief, at least one of the Officers—Tarazona—spoke Spanish.

34.    As the Officers cornered him, Mr. Morales was partially blinded by the bright headlights of the police cars. Still in obvious distress, Mr. Morales tried to create distance between himself and the officers. He was holding gardening tools—a shovel and shears—but never raised either at the Defendant Officers.

35.    On information and belief, the Defendant Officers never saw gardening shears in Mr. Morales' hands.

36.    In crisis and fearful of three armed officers rushing toward him with pistols raised and yelling at him in a language he did not understand, Mr. Morales dropped the garden shovel. Keeping his arms down at his sides, he moved to the right of the Officers in an attempt to evade the guns they had pointed at his body.

37.    Mr. Morales made no sudden movements.  He was not aggressive or belligerent. He did not struggle with the Defendant Officers.  He did not curse or yell.  He did not touch or attempt to touch the Officers.

38.    Then, Tarazona holstered his weapon because he did not see any reason for deadly force. He prepared to detain Mr. Morales with his bare hands.

39.    At that moment, only twenty-one seconds after arriving at the scene and without warning, Jean shot at Mr. Morales four times from five feet away. Three bullets struck Mr. Morales—in the shoulder, abdomen, and pelvis. Mr. Morales fell to the ground, crying and screaming in severe pain. Jean did not pause between shots to assess the need to keep shooting.

40.    Jean's use of lethal force was entirely unreasonable. When Jean fired his gun, Mr. Morales was not engaged in violent conduct, he was not actively resisting arrest, and he presented no immediate threat to any officer or civilian.

41.    Right after Jean shot his gun, Kirk released the K-9 German Shepherd. Kirk provided no warning before releasing the dog. As Mr. Morales lay on the

ground, unarmed and crying in pain, the dog ripped through Mr. Morales' skin and tissue, lacerating the muscle beneath. Mr. Morales vomited from the trauma.

42.     Despite the severity of Mr. Morales' injuries, the Officers did not come to Mr. Morales' immediate aid. They all watched as the K-9 dragged and pulled at Mr. Morales' body. They did not try to treat his serious injuries. Instead, Tarazona drew his weapon and Jean continued pointing his pistol at Mr. Morales.

43.     Kirk eventually approached Mr. Morales with his gun drawn. Before reaching for the K-9, Kirk saw Jean pointing a pistol in his and Mr. Morales' direction, and yelled at Jean: "Don't fucking shoot me, you hear me?" Jean said that he would put the gun away and made a move to holster the firearm, but he then raised the gun *back* up and continued pointing it at a dying Mr. Morales.

44.     Kirk tried unsuccessfully to remove the K-9's teeth from Mr. Morales' shoulder. Jean and Tarazona stood by and did not attempt to assist.

45.     Kirk eventually called for the administration of first aid, and Tarazona went to his vehicle to grab a first aid kit.

46.     Kirk finally removed the dog from Mr. Morales' shoulder after nearly a minute, exclaiming "god damn!" upon doing so.

47.     After the shooting and K-9 attack, Tarazona said to Jean, who continued to point his gun at the dying Mr. Morales, "less lethal, less lethal." Jean finally holstered his gun, pulled out a taser that he had had in his possession during the entire incident, and pointed it at Mr. Morales.

48.    At no time did Jean attempt to use this less-lethal taser prior to lethally shooting Mr. Morales three times in his body.

49.    After the shooting, Jean pointed first his pistol and then his taser at Mr. Morales, who was screaming "ay mama!" (calling for his mother) and "me estoy muriendo" ("I am dying").

50.    After retrieving the first aid kit, Tarazona approached Mr. Morales and attempted to handcuff him. At that point, he found garden shears with a black handle next to Mr. Morales and kicked them away.  Tarazona yelled at Mr. Morales to give him his hand to be handcuffed ("dame la otro mano!"), and Mr. Morales yelled, "no puedo, me duele la espalda!" ("I can't, my back hurts!"). On information and belief, Tarazona's instruction to Mr. Morales after the shooting was the only time any of the Officers spoke to Mr. Morales in Spanish.

51.    Two minutes and twenty-three seconds after Mr. Morales was shot, Tarazona finally began to administer first aid.

52.    On information and belief, the Defendant Officers delayed the entry of Emergency Medical Services (EMS) onto the scene. EMS was present by at least 1:23 a.m., 6 minutes after Mr. Morales was shot, but Mr. Morales was not taken to Naples Community Hospital until 2:03 a.m., nearly 40 minutes after he was shot.

53.    Mr. Morales was pronounced dead at the hospital at 2:15 a.m. The Medical Examiner determined that the manner of death was a homicide.

54.     The autopsy showed three gunshots lacerated Mr. Morales' liver, kidney, and pelvis; the wounds were certified as the cause of death. Mr. Morales also had puncture wounds from the dog attack. The K-9's teeth ripped through Mr. Morales' skin and tissue, penetrating deep enough to tear his shoulder muscle. The toxicology report showed a trace of alcohol and no drugs in his system.

55.     Following the shooting, other CCSO officers arrived at the scene.

56.     Corporal Deputy Pierstorff, who was assigned road patrol duty, took control of Jean. Pierstorff grabbed Jean by the arm and walked him towards his police vehicle, telling the other officers, "I got him." Pierstorff then put his hand up, signaling to Jean not to speak. He did so, upon information and belief, so as to avoid being overheard by the dashboard camera. Pierstorff told Jean to walk by the dashboard camera and get in the passenger seat of Jean's car.

57.     Jean then said to Pierstorff, "That is going to be a tight one," to which Pierstorff reassured Jean, "It will be alright."

58.     Waiting alone a few houses away at the time of the shooting, Mr. Morales' young son, Nick Jr., heard the police sirens and the gunshots that killed his father. His father's death by the Defendants left Nick Jr. an orphan.

59.     The CCSO video of the shooting was released nearly five months after Mr. Morales' death. The CCSO uploaded the graphic footage onto the internet without providing prior notice to Mr. Morales' family, including Nick Jr., and without allowing the family to view the video before it was made public.

## THE DEFENDANT OFFICERS VIOLATED CCSO POLICIES

60.    The Defendant Officers' conduct violated not only the law but also CCSO's policies.

### Violations of Use of Force Policies

61.    Under CCSO's response to resistance policy, force must be proportionate to a subject's resistance level. A CCSO deputy "must de-escalate the response level to the minimum response necessary to control the subject" and "safely bring the incident to a close." Deadly force techniques are to be used only as a last resort, when a subject makes "overt, hostile, attacking movements . . . with the intent and apparent ability to cause death or great bodily harm."

62.    CCSO policy includes a "Less Lethal Force Philosophy," by which officers are expected to de-escalate situations and apply responsive force in a way that "meets operational objectives, with less potential for causing death or serious physical injury than conventional police tactics."

63.    When planning a response to resistance, CCSO officers should consider the "physical factors of the subject" (*e.g.,* size, age, weight, and apparent physical ability), the number of subjects involved, the seriousness of the crime committed by the subject, and whether the subject can be recaptured later. Officers are also to consider the number of officers at the scene, the size and physical ability of the officers,  and available use of force options.

64.    By policy, officers have a duty to intervene to prevent or stop excessive force by other officers; they also must report such force to a supervisor.

65.    The Defendant Officers violated each of these provisions, failing to use proportionate force and failing to de-escalate the situation, for instance, by using negotiation tactics, slowing down the response, giving verbal commands and warnings in Spanish, and employing available less-lethal force options.

66.    The Defendant Officers did not consider Mr. Morales' small frame and disoriented mental state compared to the size, physical ability, and number of officers present, nor the less-lethal options available to them. They did not attempt to intervene or stop each other's uses of excessive force.

67.    Above all, they used deadly force when such force was totally unwarranted, and they made no effort to coordinate a non-lethal response.

68.    CCSO's Canine (K-9) policy permits officers to use dogs to apprehend individuals only when the handler reasonably believes the individual has committed or is about to commit an offense *and* the individual: (1) "poses an immediate threat of violence to the public, or him/herself"; or (2) "is physically resisting arrest" and a K-9 is "necessary to overcome such resistance."

69.    A handler must "carefully" consider all pertinent information at the scene, including the individual's age, the nature of the suspected offense, any potential danger to officers who attempt to intervene, and any potential danger to

the public from the release of a K-9. Before releasing a K-9, the handler should give a verbal warning and a reasonable period for the subject to comply.

70.    Defendant Kirk violated this policy, as Mr. Morales was not posing a threat or physically resisting arrest. In light of both the number and the size of the officers on the scene, and the availability of less-lethal options, use of a K-9 was wholly unnecessary. Kirk also gave no verbal warning before using the dog.

**Violations of Mental Health Policy**

71.    The Defendant Officers violated CCSO policy governing interactions with people who may be mentally ill and in crisis.

72.    CCSO policy requires that officers conduct a risk assessment on a person exhibiting signs of a mental health crisis. Officers must "observe and assess relevant aspects of the individual and the environment," including whether the person is suffering from hallucinations and considering factors like their appearance and their speech. Officers should speak to family and neighbors to determine what has transpired prior to their arrival and to determine mental health needs.

73.    Responding officers must "minimize stimulation in the environment," "keep instructions simple," "keep the environment as calm as possible," "speak in a low, non-threatening voice," gain trust through clear words and actions, and "ask the subject questions about mental health issues." Officers must "take the time needed to contain and stabilize the crisis scene."

74.    The Defendant Officers violated each of these policies.

75.    Though Mr. Morales exhibited clear signs of a mental health crisis — walking shirtless and barefoot and acting disoriented, fearful, and confused — the Defendant Officers did not evaluate his mental health, stabilize the situation, provide non-threatening guidance, or speak to his family, including Nick Jr., who was a few doors down and would have confirmed Mr. Morales' mental distress.

**Violations of CCSO Prohibition on False Reporting**

76.    CCSO policy requires officers to "[s]peak the truth at all times and under all circumstances"; officers are to be disciplined for "[w]illfully departing from the truth."

77.    The Defendant Officers violated the CCSO truth in reporting policy by making a litany of false statements about the shooting, including:

   a.   Defendant Kirk stated: Jean gave Mr. Morales a command to drop the shovel (he did not); Mr. Morales was 5'10'' to 6'0'' tall (he was 5'4''); Mr. Morales raised his right arm at the deputies (he did not); Mr. Morales advanced aggressively toward them *after* Kirk unleashed the K-9 (he was on the ground and wholly incapacitated).

   b.   Defendant Jean stated: "the caller had no idea" who Mr. Morales was and that he did not reside there (the caller told dispatch she thought Mr. Morales was her neighbor); Mr. Morales "ignored" his commands (Mr. Morales did not understand them); Jean "attempted to back up to create space" between himself and Mr. Morales (Jean cornered Mr. Morales).

## CCSO'S INVESTIGATIONS INTO THE MORALES SHOOTING WERE DESIGNED TO PROTECT THE OFFICERS FROM ACCOUNTABILITY

78. The Defendant Officers violated both the law and CCSO policies in their fatal encounter with Mr. Morales. Yet, the CCSO intentionally failed to adequately investigate these violations or hold the Officers accountable for their conduct, which directly resulted in the unnecessary death of a civilian.

79. The CCSO conducted two investigations into the killing of Mr. Morales: a so-called "criminal investigation" by the Major Crimes Unit ("MCU"), and an "administrative investigation" into violations of policy and procedure by the Professional Responsibility Bureau ("PRB").

80. Yet, five days after the shooting, while both investigations were pending, the CCSO issued a news release claiming Mr. Morales had charged at the Officers with a raised weapon and that the Officers had feared for their lives.

### CCSO's Flawed Criminal Investigation of the Morales Shooting

81. Per CCSO policy, Sheriff Rambosk and Office Chiefs were notified of the Defendant Officers' use of lethal force against Mr. Morales.

82. The MCU was in charge of the criminal investigation. CCSO initial reports described Mr. Morales as the "suspect" and the State of Florida as the "victim."

83. CCSO Detective David Hurm of the MCU led the criminal investigation. He interviewed three people on the morning of the shooting: the

person who called 911, Nick Jr.'s teacher, and a neighbor. The three interviews combined took about 20 minutes.

84.     Upon information and belief, Hurm did not interview Defendants Jean, Kirk, Tarazona, or any other law enforcement officers. He did not examine the Officers' personnel records. He did not attempt to investigate discrepancies between the Officers' reports and the videos. In short, he did not attempt to determine whether the Officers engaged in criminal conduct, including excessive use of force.

85.     Hurm submitted a supplementary report on September 22, 2020 — before Jean submitted his own use of force report. Hurm's report summarizes his "investigative" work, which consisted of responding to the scene, reviewing the shooting video, and talking to three people, none of whom were involved in the uses of force. The MCU also did not evaluate whether Kirk's use of force constituted a criminal battery.

86.     The criminal investigation was then suspended pending review by the State Attorney's Office ("SAO").

87.     On February 9, 2021, the SAO concluded its review of the shooting, relying on Hurm's "investigation." It found the killing of Mr. Morales justified. The SAO immediately informed Sheriff Rambosk of the decision.

**CCSO's Flawed Administrative Investigation of the Morales Shooting**

88.     The role of the PRB is to "protect[] the relationship between the CCSO and the public by investigating all allegations made against CCSO members by the public or any agency member." By CCSO policy, the PRB is tasked with separately and independently investigating potential CCSO policy violations committed by its officers. The PRB recommends appropriate discipline. The Sheriff determines the final disposition of the investigation.

89.     The PRB did not conduct a genuine investigation into the violations committed by the Defendant Officers and thus provided tacit approval for their misconduct. Sheriff Rambosk approved PRB's lack of investigation and lack of discipline.

90.     The fatal shooting of Mr. Morales was referred to the PRB on September 18, 2020, the day after the shooting. The PRB failed to undertake any investigation until February 17, 2021, six months later, and only after the flawed criminal investigation concluded, a delay that violated CCSO policy.

91.     CCSO policy requires that officers involved in an officer-involved shooting be relieved of their duties pending an administrative review, and that the Sheriff be notified of the incident. Upon information and belief, Defendant Jean was the only officer to be placed on administrative leave after the shooting. He returned to active duty after one week, while the PRB review was ongoing.

92.     CCSO policy dictates that officers who use physical force must submit a Response to Resistance ("use of force") report. The Defendant Officers' reports were filled with false information, as detailed in paragraph 77, above.

93.     Each of the Defendant Officers was afforded the opportunity to review "the whole case file and any related documents or videos" prior to being interviewed by the PRB, tainting their interviews and the PRB's investigation.

94.     The assigned PRB investigator, Sergeant C. E. Frost, interviewed Defendant Tarazona more than five months after the shooting. The entire interview lasted no more than 9 minutes.

95.     In the interview, Frost assumed that the shooting was justified, and he only asked questions to bolster that faulty assumption. Frost did not ask Tarazona any questions about Defendant Kirk's or Jean's conduct, though Tarazona was an eyewitness to the shooting and dog mauling and though he had a duty to intervene to prevent excessive force.

96.     Frost interviewed Sergeant William Gifford, the supervisor of the CCSO K-9 unit, also more than five months after the shooting. The interview lasted 7 minutes. Frost used leading questions designed to exculpate Kirk.

97.      Two weeks later, Frost interviewed Kirk. That interview lasted 9 minutes. Frost asked leading questions to bolster the conclusion that Kirk's response at the scene was justified.

98.    Frost did not ask Kirk objective questions to determine whether the use of the K-9 was reasonable and in compliance with CCSO policy. Frost did not ask Kirk why he did not verbally recall or retrieve his K-9 after it attacked Mr. Morales, why he did not immediately act to physically remove the K-9, or why he delayed medical care to Mr. Morales. Frost did not ask Kirk about his failure to intervene to stop Jean from shooting. Frost did not question Kirk about his false reporting about the incident.

99.    Frost interviewed Jean on April 12, 2021, three weeks after interviewing Kirk and almost seven months after he killed Mr. Morales. Frost spoke with Jean for only 3 minutes.

100.    Frost's only substantive question was about the CCSO's two-fold test, which governs when it is acceptable for an officer to use lethal force under CCSO policy. Jean misstated that test. Frost unquestioningly accepted both Jean's misstatement of the policy and Jean's assertion that he met the test.

101.    Frost did not actually investigate whether Jean violated CCSO's use of force policy.

102.    Frost did not investigate or question Jean about his false reports.

103.    Frost did not assess any of the Defendant Officers' conduct in reference to the CCSO's use of force policy. Frost did not investigate or ask the Officers to articulate what danger, if any, Mr. Morales posed to the Officers or

22

others. Frost never asked about Mr. Morales' mental state, whether he appeared to be in distress, or whether he seemed to understand the Officers' commands.

104.    Frost also never investigated or questioned Tarazona, Kirk, or Jean about their failure to abide by other relevant CCSO policies in their response to the scene, as described in paragraphs 72 to 76, above.

105.    Two days after interviewing Jean, and without interviewing civilian witnesses, Frost submitted the "investigation" to the PRB Finding Authority.

106.    PRB Lieutenant Lopez recommended that the Defendant Officers be exonerated. PRB Captain Gary Martin and the Chief of the PRB Finding Authority, Chris Roberts, concurred. Jean, Kirk, and Tarazona were thereafter exonerated of all wrongdoing. On information and belief, as the final arbiter of CCSO discipline, the Sheriff was informed of the investigation and the outcome, and he concurred with the findings.

107.    There was no independent agency review of Mr. Morales' shooting.

108.    In September 2020, the CCSO utilized the Citizen's Review Panel (CRP), charged with reviewing closed administrative investigations of unreasonable force and sending findings and recommendations to the Sheriff.

109.    The CRP was formed in April 2001 in response to the shooting of a Black man by a white police officer in Naples. It was created to increase public confidence in the CCSO, providing a "direct, participatory opportunity for

qualified, responsible individuals to review closed internal investigations conducted by CCSO's Professional Responsibility Bureau (PRB)."

110.    The CRP was comprised of citizens and CCSO agency members. It did not have independent authority over CCSO officer discipline. The panel reviewed 28 cases in 2020; in each, the CRP agreed with the CCSO determination.

111.    The CRP reviewed the PRB investigation of the killing of Mr. Morales on December 1, 2021. The CRP did not conduct an objective analysis. The CRP heard only evidence from CCSO employees, who unreasonably credited the Officers' account of the incident. The CCSO did not allow the representative of Mr. Morales' estate, Jesse Andrade, to speak.

112.    In a further attempt to justify the Defendant Officers' misconduct, the CCSO officers presenting the case to the CRP misstated the two-fold test. The presenter stated that when the "failure of the deputy to use deadly force poses an imminent threat of death or serious physical injury to the deputy or to others, then the deputy is *obligated* to act." In fact, an officer never has an obligation to use deadly force, under CCSO policy or the law.

113.    Based on the CCSO's biased presentation, the CRP signed off on the exoneration of the Defendant Officers.

114.    In response to the attendance of concerned community members at the CRP meeting in which Mr. Morales' killing was reviewed, the CRP was reconstituted as the "Sheriff's Advisory Review Panel" and stripped of its power

to provide recommendations to the Sheriff on officers' unreasonable uses of force. The Panel has not met since, and it has officially been put on hiatus by the CCSO. There is now no civilian oversight of CCSO misconduct in Collier County.

115.    As a result of the CCSO's failure to provide an objective inquiry into the legal and policy violations that occurred during the Morales shooting, the Defendant Officers escaped any form of accountability.

### THE CCSO FAILED TO ADEQUATELY SCREEN, SUPERVISE AND RETAIN DEFENDANT JEAN PRIOR TO THE SHOOTING

116.    Under CCSO policy, officer retention and employment decisions are within the Sheriff's sole discretion.

117.    The CCSO, through Sheriff Rambosk, failed to adequately screen, supervise, and retain Defendant Jean, turning a blind eye to evidence that his promotion to law enforcement officer and continued employment created a serious risk of physical harm to the civilians he patrolled.

118.    Jean's employment records indicate that he should have never been allowed to work as an armed law enforcement officer. The CCSO's inadequate screening, supervision, and retention of Jean violated its own policies and Florida's Department of Law Enforcement Standards

119.    The CCSO conducted a pre-employment background check in 2014 when Jean applied to be a CCSO correctional officer. The report states that Jean admitted to many acts of unlawful or untruthful behavior that undermined his

judgment, integrity, and ability to serve as an officer. These included: suffering from and failing to treat Post Traumatic Stress Disorder (PTSD), with which he was diagnosed upon his separation from the military; multiple instances of driving drunk; using a false social security number; participating in a "5 links pyramid" scheme business; entering a marriage with the intent of gaining U.S. citizenship; and being prescribed narcotic pain killers and giving them to a soldier who offered to buy them.

120.    The CCSO learned Jean had previously been rejected for employment by the nearby Lee County Sheriff's Office, allegedly based on statements Jean himself made during the hiring process.

121.    Despite this record, Jean began serving as a CCSO correctional officer in 2015. In 2017, he entered the CCSO Law Enforcement Academy for the first time. Jean's personnel file indicates that he performed poorly as a recruit.

122.    The Academy's field training program requires recruits to pass multiple "phases" to become deputies. Jean had serious problems completing all but the most basic aspects of field training (Phase 1). The CCSO documented the deficiencies that led to Jean's failure to progress at different phases.

123.    In Phase 2, CCSO documented that Jean was deficient in areas that included: report writing, knowledge of criminal statutes, investigative procedures, patrol procedures, and driving in "stress conditions." Jean was also unable to define the "two-fold" deadly force test.

124.    Despite these failings, the CCSO allowed Jean to move on to Phase 3, where the CCSO documented that he remained deficient in numerous areas, including operating under "stress conditions" and report writing.

125.    Jean was granted an extension to complete Phase 3.  He continued to prove he was unfit for duty. The CCSO documented Jean's deficiencies: officer safety, report writing, field performance under stress and non-stress conditions, problem solving and decision-making skills, investigative procedures, and criminal statute knowledge.

126.    In Phase 3, Jean was still unable to properly explain the two-fold deadly force test governing when it is acceptable for an officer to use lethal force.

127.    While undergoing this field training, Jean "misplaced" drug evidence in his own mailbox. CCSO Sergeant Howell wrote a memo about Jean's failure to properly secure drug evidence.

128.    Documentation from Sergeant Pedraza at this time further indicated that Howell did "not trust [] Jean to properly handle any call." Pedraza also recommended that Jean not be allowed to complete the field training program in part because she "question[ed] his integrity in regards to telling the truth in regards to the misplaced evidence and his truthfulness when it comes to providing accurate information on his reports."

129.    On April 22, 2018, CCSO Corporal Kettering wrote a memo recommending that Jean not progress in the training program due to "several

questionable officer safety errors" and because he had "to be repeatedly counseled on what to do to prevent them from occurring; poor report writing, and shutting down during active incidents when several tasks need to be completed." Kettering also wrote: "It appears that D/S Jean gets tunnel vision and forgets basic Law Enforcement aspects of the job."

130.   Jean thereafter failed the Academy and returned to corrections.

131.   Shortly after, on July 26, 2018, the PRB opened an investigation into an allegation of domestic violence against Jean stemming from an incident the previous year. Jean was accused of punching and groping the spouse of a CCSO officer.  An eyewitness verified the complainant's account.

132.   The PRB had the option to fully exonerate Jean, but instead it determined the allegations were "not sustained." This finding was approved by Chief Chris Roberts, Captain Mark Baker, and Lieutenant Richard Gibbons. Sheriff Rambosk was provided written notification of the complaint and, on information and belief, the outcome of the PRB investigation. Jean was not disciplined.

133.   Despite failing the Academy in late 2019, Jean again attempted to transfer to law enforcement. In early 2020, he re-entered the Academy.

134.   Jean was promoted by the CCSO to deputy in 2020, months before the Morales shooting.

135.    Jean's CCSO personnel records do not indicate that he resolved any of his serious deficiencies in performing basic police work, responding to high stakes scenarios, or knowing when lethal force is justified.

136.    The CCSO failed to take supervisory or remedial action to address Jean's physical violence and policing deficits. Despite the obvious risks to civilians from his continued employment, Jean was promoted to an armed officer.

137.    Given his record, and CCSO's own documentation of Jean's poor performance, it was entirely foreseeable that Jean would use excessive and unreasonable lethal force while on duty.  And he did, when he shot and killed Mr. Morales without cause shortly after being promoted by the CCSO.

## THE CCSO HAS A PATTERN OF USING UNREASONABLE FORCE ON CIVILIANS AND A CUSTOM OF FAILED ACCOUNTABILITY

138.    The Defendant Officers' unlawful shooting of Mr. Morales and the subsequent cover-up of the misconduct by CCSO officers was not an outlier but part of a larger pattern of violence and impunity in the CCSO.

139.    The CCSO, through its officers, has a practice and custom of using unreasonable and excessive force against civilians, in violation of the Fourth Amendment, CCSO policies governing use of force, and related regulations.

140.    CCSO also has a *de facto* policy and custom of failed accountability for such violence, which has been tolerated by CCSO superiors and ratified at the highest channels in the Office. On belief, the CCSO has never sought criminal

charges against any officer who engaged in unlawful physical force. While these incidents were purportedly "investigated" by the PRB, each resulted in little to no discipline for the officers, even where they engaged in clear policy violations, including failure to abide by CCSO policies governing response to resistance, de-escalation, mental health, report writing, and other law enforcement directives.

141.    Sheriff Rambosk, the final agency policymaker, and other top officials in the CCSO had knowledge of and signed off on each of these investigations, as a matter of CCSO policy and practice. In doing so, CCSO officials deliberately approved and acquiesced in the misconduct of its officers and perpetuated a culture of violence and impunity in the CCSO.

142.    The CCSO's custom of permitting its officers to use unreasonable violence against civilians and engage in other serious policy violations was the driving force behind the tragic shooting and mauling of Mr. Morales.

143.    CCSO's systematic pattern of excessive force, policy violations, and lack of accountability include, but are not limited to, the following incidents:

144.    **Robert Dale Harris:** Harris complained to the CCSO about a history of harassment and excessive force by CCSO officers, between 2014 and 2017.

145.    In 2014, Harris was leaving a storage facility on a bike when CCSO officers approached him. A Corporal allegedly tried to contact Harris on suspicion of loitering following a series of burglaries in the area. Harris had a valid reason to be in the area, which a secondary witness could confirm. The Corporal, lacking

cause to detain Harris, did not notify Harris he was under arrest but instead demanded to see his identification. When Harris refused, the CCSO officer called backup from another officer and attempted to arrest him. The first Corporal then tried to forcibly remove Harris from his bike.

146.   The officers pulled Harris to the ground and began punching him.  A Corporal tased Harris and then used a stun gun when the taser was ineffective. Other officers responded to the scene, and one began striking Harris with a baton. While Harris was on the ground, that officer then tased Harris.

147.   Harris was arrested, but the charges against him were dropped for insufficient evidence to prosecute.

148.   The officer had no basis to use such extreme force where Harris declined to show his identification or allow himself to be forcibly removed from his bike, when the officer lacked probable cause to detain him.  At no time did the CCSO officers attempt to de-escalate the situation or use alternatives to force, also in violation of CCSO policy.

149.   The officers' use of force was excessive and violated CCSO policy on responses to resistance, as set forth in paragraphs 61 to 64, above.

150.   Yet, during the internal investigation conducted by the PRB, the investigators failed to consider whether it was appropriate or lawful for the CCSO officers to use serious physical force in response to a civilian's refusal to show identification. They also did not investigate the other policy violations committed

by the officers. Despite finding that the Corporal and backup officer "provoked" the encounter with Harris and that their actions were "improper," the PRB held the charges of excessive force and unlawful conduct were not sustained.

151.    The PRB did sustain a charge against the first Corporal for carelessness in duty performance, for which the Corporal received only a coaching summary. CCSO officials, including Chief Chris Roberts, Captain Mark Baker, and Lieutenant Richard Gibbons, officially signed off on the substantive lack of discipline, immunizing the officers from accountability. Sheriff Rambosk was directly alerted of the charges and investigation; on information and belief, he approved the lack of substantive discipline. The CCSO's failure to properly investigate or discipline officers in this matter violated CCSO policy.

152.    In 2016, a CCSO sergeant conducted a traffic stop of Harris and again requested identification. The Sergeant failed to identify himself or the purpose of the stop, as video of the incident revealed. Harris requested to call his attorney and the Sergeant did not allow him to do so. The Sergeant then demanded Harris get out of the car and opened the door to the vehicle; Harris refused and pulled the door shut. At that point, the Sergeant attempted to deploy a taser and stun gun. The Sergeant also entered Harris' car and started wrestling him, delivering several punches to his face and chest. During this encounter, the Sergeant was caught on camera stating: "I'm going to fucking shoot you if you don't get out of the car" and "I'm going to fucking hurt you so bad in a second."

153.   The Sergeant subsequently wrote reports about this incident that deviated from the video evidence.

154.   The Sergeant's use of force was excessive and violated CCSO policy on responses to resistance, as set forth in paragraphs 61 to 64, above.

155.   During the internal investigation conducted by the PRB, the investigators failed to consider whether it was appropriate or lawful for the CCSO officer to use serious physical force during an unlawful traffic stop. They also did not investigate other infractions committed by the officer, including falsification of reports, which violates CCSO policy, as set forth in paragraph 76, above. While the PRB investigation noted that the Sergeant's reports did "not match" what was seen on the video, the PRB failed to consider whether the officer's report had also been falsified. The PRB issued a finding of "not sustained" against the Sergeant for excessive force and falsification of reports. The PRB did sustain a charge of carelessness in duty performance, for which the Sergeant received only probation and remedial training.

156.   CCSO officials, including Chief Jim Bloom, Captain Mark Baker, and Lieutenant Richard Gibbons, signed off on the substantive lack of discipline, immunizing the Sergeant from accountability. Sheriff Rambosk was directly alerted of the charges and investigation and was quoted in the local newspaper about the incident. On information and belief, the Sheriff approved the lack of

substantive discipline. The CCSO's failure to properly investigate or discipline officers in this matter violated CCSO policy.

157.    **Enrique Sierra:** In 2016, two CCSO Corporals responded to an alleged domestic disturbance at the house of Sierra. The Corporals had no warrant. When one of the Corporals attempted to make contact with Sierra, Sierra tried to close the door and deny entry to the officers.

158.    The officer grabbed Sierra by the arm, demanded he come outside, and attempted to tase him. When the taser misfired, the officer pursued Sierra into his house, without cause. The other responding officer then pepper sprayed Sierra, and both Corporals tackled Sierra to the ground. At no time did the CCSO officers attempt to de-escalate the situation or use alternatives to force, also in violation of CCSO policy.

159.    The officers' use of force was excessive and violated CCSO policy on responses to resistance, as set forth in paragraphs 61 to 64, above. Each use of force was precipitous and entirely unreasonable, particularly as the officers had no cause to enter Sierra's house, and Sierra did not present a threat and was only trying to prevent being detained unlawfully.

160.    The PRB investigation determined that the Corporals had no "valid reason to enter the residence and detain Mr. Sierra." Yet, during the internal investigation, the investigators failed to consider whether it was appropriate or lawful for the CCSO officers to use serious physical force, including tasing and

spraying, in response to a civilian's refusal to allow CCSO's unlawful entry. It also did not investigate the other policy violations committed by the officers, including the failure to de-escalate or use alternatives to force.

161. The officers were exonerated for using excessive force in this matter. CCSO officials, including Chief Jim Bloom, Captain Mark Baker, and Lieutenant Richard Gibbons, signed off on the lack of discipline, immunizing the officers from accountability. Sheriff Rambosk was directly alerted of the charges and investigation; on information and belief, he also approved of the officers' exoneration. The CCSO's failure to properly investigate or discipline officers in this matter violated CCSO policy.

162. **Serge Prophete:** Prophete complained to the CCSO about a history of harassment by CCSO officers.

163. In 2017, Prophete and two friends, one a juvenile, were allegedly smoking marijuana. A CCSO Corporal responded to the scene claiming he smelled marijuana. The Corporal, who arrived with a K-9 dog, did not turn on his audio recording device during the response. On his arrival to the scene, the Corporal ordered the three to sit with their hands visible while backup arrived. One of Prophete's friends had his hands in his pockets, so the Corporal drew his gun, pointed it at Prophete's friend, and ordered him to remove his hands from his pockets. The Corporal then struck Prophete's friend with a closed fist.

164.    Another Corporal and trainee officer arrived. The latter approached the scene with his taser drawn. The arriving Corporal told Prophete to get on the ground. As Prophete began to kneel, the officer kicked him in the chest, knocked him over, and began tasing him. At the time he was kicked and tased, Prophete was complying with the Corporal's orders and posed no threat to others.

165.    Thereafter, the first arriving Corporal sicced his police K-9 on Prophete. The dog bit Prophete, causing deep wounds. The responding officers then struck Prophete's rib cage repeatedly. After being handcuffed, Prophete was transported to the hospital for treatment of open wounds.

166.    The officers' use of force was excessive and violated CCSO policy on responses to resistance, as set forth in paragraphs 61 to 64, above. The Corporals' use of a taser and a K-9 on a person who was subdued, obeying, and presenting no threat to any person was unreasonable and disproportionate. At no time did the CCSO officers attempt to de-escalate the situation or use alternatives to force, also in violation of CCSO policy.

167.    Despite the fact that the officers engaged in assault and battery on an unarmed person who was in the process of complying with commands, no charges were pressed against the officers. During the internal investigation conducted by the PRB, the investigators failed to consider whether it was appropriate for the CCSO officers to tase, kick, punch, and sic a K-9 on a civilian who was already restrained, who presented no threat, and who was suspected of minor drug

possession. It also did not investigate other policy violations committed by the officers, including the failure to de-escalate.

168.   No officers were disciplined in this matter. Each was exonerated of excessive use of force and other policy violations. CCSO officials, including Captain Mark Baker, Chief Jim Bloom, and Lieutenant Richard Gibbons, signed off on the lack of discipline, immunizing the officers from accountability.  Sheriff Rambosk was directly alerted of the charges and investigation; on information and belief, he also approved of the officers' exoneration. The CCSO's failure to properly investigate or discipline officers in this matter violated CCSO policy.

169.   **James Fred Barfield:** In July 2011, the CCSO responded to a call reporting a suspicious vehicle in a shopping center parking lot. Mr. Barfield had been driving to Naples to mail a letter when he felt dizzy and pulled into the parking lot and called his doctor. A CCSO officer approached the vehicle and observed Barfield in the driver's seat. The CCSO officer asked him what his business was in the shopping center, and Barfield was unable to reply. The officer asked Barfield to step out of the car. Barfield complied but could not maintain his balance without holding onto the door frame. Barfield had difficulty standing, and the officer had to prevent him from falling to the ground twice. The officer then attempted to handcuff Barfield, who reached out for the window frame and pulled himself against his vehicle.

170.    The officer then ordered Barfield to stop resisting the handcuffing and called for backup. He ordered Barfield to the ground, and when Barfield attempted to get back into his vehicle, the officer tased Barfield. When another CCSO officer arrived on the scene, he assisted the first officer in forcing Barfield to stand up so they could handcuff him. When he was standing, Barfield grabbed at the steering wheel and tried to get into his car. The first CCSO officer then tased Barfield again, and he fell on the pavement.  The first officer tased Barfield two more times, while the second officer attempted to handcuff him. During this encounter, the officer also inadvertently tased himself and his fellow officer.

171.    The second officer then picked up the taser and delivered a drive stun to Barfield. He then struck Barfield in the upper shoulder area. A third CCSO officer then arrived and delivered a sixth taser strike to Barfield, this time in his lower back. A fourth CCSO officer subsequently arrived on the scene and struck Barfield three times in the arm while attempting to handcuff him. At this point, the first CCSO officer delivered a burst of pepper spray to Barfield's face.

172.    At no point did Barfield speak a word to the officers subduing him. He was charged with resisting arrest, which was not prosecuted.

173.    The officers' use of force was excessive and violated CCSO policy on responses to resistance, as set forth in paragraphs 61 to 64, above. The officers used

six consecutive taser deployments, pepper spray, and the other pain compliance techniques to subdue an unarmed, confused, and insensible seventy-year-old man who had committed no crime and had no weapons. In violation of CCSO policy, at no time did the CCSO officers attempt to de-escalate the situation or use alternatives to force.

174. Barfield filed a complaint with CCSO, but the officers were not held accountable for their actions. No charges were pressed against the officers. On information and belief, Sheriff Rambosk was both alerted of the charges and approved the lack of discipline against the officers.

175. Barfield filed a civil rights complaint against the Collier County Sheriff in the Middle District of Florida alleging unconstitutional use of force. It was dismissed on summary judgment on grounds of qualified immunity.

176. **C.P.:** In December 2013, C.P., a child diagnosed with autism, was standing outside of his apartment waiting for his father to return from work. Two CCSO officers were dispatched to his location in reference to a "suspicious person," who the 911 caller referred to as a "slow kid that lives in my neighborhood."

177. CCSO officers approached C.P. and asked if he lived in the building, to which C.P. responded by pointing to the building. When C.P. moved away from

the CCSO officers, one of them performed a leg sweep, taking C.P. to the ground. The officers then used a taser against C.P. for at least six cycles. The two officers then proceeded to hit C.P. with their aluminum flashlights and their fists in his sides and on his head. One CCSO officer then used his taser again directly on C.P.'s right side for four cycles.

178.    After tasing, tackling, and beating C.P. with fists and aluminum flashlights, CCSO officers handcuffed him and called emergency services. C.P. required transport to a hospital.

179.    C.P. was charged with battery of a law enforcement officer and resisting an officer with violence in a juvenile delinquency proceeding, but the charges were dropped and the case was dismissed.

180.    The officers' use of force was excessive and violated CCSO policy on responses to resistance, as set forth in paragraphs 61 to 64, above. The taser deployments, the use of aluminum flashlights to beat the child, and the other pain compliance techniques were entirely unreasonable, particularly as C.P. was an unarmed child with a disability who had committed no crime and did not present a threat to the officers or the public. Such tactics, under CCSO policy, are only to be used if an individual is engaging in "Active Physical Resistance" to officers. At

no time did the CCSO officers attempt to de-escalate the situation or use alternatives to force, also in violation of CCSO policy.

181.    The involved officers were not held accountable for their actions.  No charges were pressed against the officers. On information and belief, Sheriff Rambosk was both alerted of the incident and approved the lack of discipline against the officers.

182.    C.P., through his parents, filed a civil rights complaint in the Middle District of Florida, alleging claims of excessive force in violation of the Fourth and Fourteenth Amendments against the CCSO officers involved, and alleging *Monell* claims against the CCSO for perpetuating a pattern and practice of excessive use of force and failure to train and supervise officers. In that litigation, the CCSO admitted that one of the officers involved had received six complaints for excessive use of force in recent years, and that both of the officers involved had deployed their tasers multiple times leading up to this incident. A motion for summary judgment on the *Monell* claim against the County was denied, and the CCSO settled the case before the conclusion of the trial.

183.    **William Yates:** In 2009, Yates was approached by two CCSO deputies at a nightclub. The deputies asked Yates, who was wearing headphones at the time, for identification and he did not provide it. The deputies claimed Yates

41

seemed to be "under the influence of a controlled substance or suffering from a mental disorder." Based on that "suspicion," the deputies tackled Yates to the floor and tased him in the back, near his spinal cord, three times over the course of only 45 seconds.

184.    Yates was arrested for possession of marijuana and spent 25 days in jail.  The charges against him were later dropped.

185.    The deputies' use of force was excessive and violated CCSO policy on response to resistance, as set forth in paragraphs 61 to 64. The three taser deployments were precipitous and entirely unreasonable, particularly as Yates had not engaged in criminal conduct, was not resisting, and did not present a threat. At no time did the CCSO officers attempt to de-escalate the situation or use alternatives to force.

186.    Yet, during the internal investigation conducted by the PRB, the investigators failed to consider whether it was appropriate or lawful for the CCSO deputy to repeatedly use a taser on a person who only refused to show identification and presented no threat.  It also did not investigate the other policy violations committed by the deputy, including their failure to de-escalate the situation and their improper response to someone with potential mental health needs.

187.    The deputies were exonerated. CCSO officials, including Chief Tim Guerrette and Lieutenant Laura Lopez, signed off on the lack of discipline,

immunizing the officers from accountability. Sheriff Rambosk was directly alerted of the charges and investigation; on information and belief, he approved of the officers' exoneration. No charges were pressed against the officers. The CCSO's failure to properly investigate or discipline officers in this matter violated CCSO policy.

188. **Jonathan Vincent Weber:** In March 2020, Mr. Weber was stopped in his car by CCSO officers. The officers later admitted they pretextually stopped Weber for speeding. Two other officers arrived at the scene after the initial stop.

189. Once stopped, the officers alleged Weber reached for his back pocket and so the officers attempted to remove Weber from the car through the car window. When this attempt failed, the officers simultaneously tased Weber—one shock on Weber's backside and one shock on his frontside. One of the officers thereafter tased Weber another time. The officers then brought Weber to the ground and sprayed him in his face with oleoresin capsicum (OC spray). An officer screamed at Weber that he was going to "break his wrist." Weber was pushed onto the hood of the car and subjected to "pain compliance techniques."

190. Weber had no weapon on him. He was arrested on narcotics-related charges.

191. The officers' use of force was excessive and violated the CCSO response to resistance policy, as set forth in paragraphs 61 to 64, above. The two simultaneous taser deployments, the use of OC spray, and the other pain

compliance techniques were entirely unreasonable, particularly as Weber was unarmed, was being stopped for a pretextual traffic offense, did not present a threat to the officers or the public, and had not exhibited resistance that would have warranted such uses of force. At no time did the CCSO officers attempt to de-escalate the situation or use alternatives to force, also in violation of CCSO policy.

192.   Yet, during the internal investigation conducted by the PRB, the investigators failed to consider whether it was appropriate or lawful for the CCSO officers to simultaneously tase a person during a traffic stop and use OC spray and pain compliance techniques, where the person presented no threat. They also did not investigate the other policy violations committed by the officers, including their use of a pretextual stop.

193.   The officers were found guilty of minor policy violations, including for inefficiency in the performance of assigned duties and bringing the CCSO into disrepute. They received counseling as punishment. CCSO officials, including Chief Tim Guerrette and Lieutenant Laura Lopez, exonerated the officers of excessive use of force, immunizing the officers from accountability. Sheriff Rambosk was directly alerted of the charges and investigation; on information and belief, he also approved the lack of substantive discipline. The CCSO's failure to properly investigate or discipline officers in this matter violated CCSO policy.

194. **James Augustin:** In 2018, a bar employee called CCSO to report that Augustin was allegedly trespassing, as another employee purportedly had a protective order against him. A CCSO deputy responded. Prior to arriving at the scene, the deputy checked CCSO's records and knew that no protective order had been served on Augustin. But once at the scene, the officer confronted Augustin and asked him to go outside with him. Augustin complied. The deputy then attempted to arrest Augustin without cause. The two scuffled and the officer tried to leg sweep Augustin, before repeatedly tasing and using a drive stun on Augustin. Augustin was handcuffed and transported to the hospital.

195. Even though the officer knew the protective order had not been served, the deputy arrested and charged Augustin with violating the order, subjecting him to false arrest. The deputy later lied about the circumstances surrounding the false arrest in official CCSO reports.

196. The officer's use of force was excessive and violated CCSO policy, as set forth in paragraphs 61 to 64, above.

197. After the incident, the deputy authored a report in which he falsely stated that he had confirmed the protective order had been served before he arrived at the scene. Other evidence, including an audio recording, confirmed that the deputy knew the protective order had *not* been served at the time he confronted Augustin.  The deputy's false reporting violated CCSO policy.

198.    Yet, during the internal investigation conducted by the PRB, the investigators failed to consider whether it was appropriate or lawful for the CCSO officer to repeatedly use a taser and stun gun based on false evidence and on a person who was already subdued. The PRB also failed to consider whether the officer's use of force report had been falsified, given his other false reports in the matter. Instead, in that investigation, the officer was found guilty of willful and wanton neglect in his duties and flagrantly violating CCSO policies but he was exonerated from the use of force. He was also not disciplined for false arrest or for false reporting, even though the PRB determined there was "evidence to prove [the deputy] included information in his reports as fact/s which were not entirely accurate."

199.    The deputy received probation and two days with no pay. He was not charged or terminated. CCSO officials, including Chief Jim Bloom and Lieutenant Laura Lopez, signed off on the substantive lack of discipline, immunizing the officer from accountability. Sheriff Rambosk was directly alerted of the charges and investigation; on information and belief, he approved the lack of substantive discipline. The CCSO's failure to properly investigate or discipline the officer in this matter violated CCSO policy.

200.    **COC20-013 – John Doe:** In 2020, a CCSO Corporal responded to a call concerning a domestic disturbance at an inn. The Corporal claimed that when he arrived, he saw a man attempting to break into the inn. In a subsequent report of

the incident, the CCSO officer claimed the man resisted arrest. The Corporal tased the man, purportedly in response to his resistance.

201.    A CCSO Sergeant who also responded to the scene determined the CCSO officer unnecessarily escalated the incident. When the Sergeant reviewed the dashcam footage of the incident, he found it conflicted with the Corporal's account. According to the footage, the man was sitting at the doorstep and not actively trying to break in. The footage also showed the man did not resist but rather complied with the Corporal's commands.

202.    The officer's use of force was excessive and violated CCSO policy on responses to resistance, as set forth in paragraphs 61 to 64, above. The man posed no threat and was complying with officer commands at the time of the taser deployment. Though the battery was caught on law enforcement video, the CCSO did not file charges against the officer.

203.    The PRB investigation noted that the Corporal's report of the incident "was not supported by what was on video" and that at the time the Corporal used a taser, the victim was not resisting, so that the force was "unnecessary." The PRB found that the charges of unnecessary force and willfully departing from the truth were sustained. The State's Attorney thereafter determined that the Corporal's veracity and professionalism had been undermined, and thus he would no longer be permitted to provide evidence for the State in criminal cases.

204.    Despite the seriousness of these findings, CCSO officials, including Captain Gary Martin, Chief Tim Guerrette, and Lieutenant Laura Lopez, did not terminate or seek to charge the Corporal, but rather signed off on minimal discipline, including one year of probation, one week without pay, and remedial training.  The findings report was forwarded to Sheriff Rambosk in early 2021; on information and belief, he approved the lack of substantive discipline.

205.    **Anthony Ryan Sartori:** On October 22, 2014, Sartori's wife called 911 because she feared her husband was having a seizure. She told the call-taker that he had not taken any medication or illegal drugs. CCSO officers responded to the call, having been told that Sartori was having a seizure.

206.    When the officers came to the door, Sartori, who was naked except for his boxer shorts, stumbled out of his bedroom and into the living room. He approached the officers, fell to the ground, and was ordered to remain there by the CCSO officers.  When he got up, one of the officers discharged his taser seven times in less than two minutes, striking Sartori at least twice.

207.    The CCSO officers then beat him, pinned him to the ground, and attempted to hog-tie him before EMS arrived. He had multiple large bruises in his kidney area and on his knees and left side. He was diagnosed with a temporal seizure after his stay in the hospital and was never charged with a crime.

208.   The officers' use of force was excessive and violated CCSO policy on responses to resistance, as set forth in paragraphs 61 to 64, above. The use of a taser on a person who was unarmed and who police had been told was experiencing a medical emergency was entirely unreasonable and violated CCSO policy on responses to resistance. At no time did the CCSO officers attempt to de-escalate the situation or use alternatives to force, also in violation of CCSO policy.

209.   The officers were not held accountable for their actions. No charges were pressed against the officers. On information and belief, Sheriff Rambosk was both alerted of the incident and approved the officers' lack of discipline.

210.   Sartori filed a civil rights complaint in the Middle District of Florida, alleging claims of excessive force in violation of the Fourth and Fourteenth Amendments against the CCSO officers involved. It was dismissed on summary judgment on grounds of qualified immunity.

211.   **Phillip John Mugford:** In 2018, a CCSO deputy stopped Mugford and a friend after hearing reports that they crashed a vehicle and fled the scene.  A CCSO Corporal handcuffed Mugford without incident. Once in the vehicle, Mugford began banging his head against the window. The Corporal opened the passenger door, pushed Mugford against the seat, and told him to stop. Mugford initially complied, but then again began banging his head on the window and kicking the car door. When the Corporal again opened the door, a struggle ensued.

At that point, another Corporal came over, pepper sprayed Mugford, placed his legs in shackles, and returned him to the vehicle. Mugford continued banging his head against the door and was pepper sprayed again by a Corporal. A CCSO officer also pointed a taser at Mugford. At no time did the CCSO officers attempt to de-escalate the situation or use alternatives to force.

212.   The officers' use of force was excessive and violated CCSO policy on responses to resistance, as set forth in paragraphs 61 to 64, above. In particular, the Corporal's pepper spraying of Mugford was entirely unreasonable and disproportionate to any risk he presented at that time, when he was fully restrained inside a CCSO vehicle.

213.   During the internal investigation conducted by the PRB, the investigators failed to consider whether it was appropriate or lawful for the CCSO officers to use pepper spray on a civilian who was already restrained and subdued in a police vehicle.  It also did not investigate the other policy violations committed by the officer, including the failure to de-escalate.

214.   The officers were exonerated of excessive use of force. CCSO officials, including Chief Jim Bloom, Lieutenant Richard Gibbons, and Captain Mark Baker, signed off on the lack of discipline, immunizing the officers from accountability. Sheriff Rambosk was directly alerted of the charges and investigation; on information and belief, he also approved of the officers' exoneration. The CCSO's

failure to properly investigate or discipline officers in this matter violated CCSO policy.

215.    **Joshua Roth:** On September 8, 2017, Roth objected to CCSO Corporal Caudill abusing an elderly detainee at the Naples Jail Center. In response, a CCSO Corporal walked up to Roth and grabbed the sleeve on his uniform.  Roth pulled his arm away. Though Roth did not present any threat and though Roth had only spoken out to protect another detainee from harm, the Corporal aggressively threw Roth to the floor. While Roth was incapacitated, another Corporal tased Roth, placing the taser directly on his body. In the PRB proceedings, Roth alleged he was assaulted and battered by CCSO deputies. Another officer witnessed the Corporal's take-down of Roth.

216.    The officers' use of force was excessive and violated CCSO policy on responses to resistance, as set forth in paragraphs 61 to 64, above. Each use of force was precipitous, retaliatory, and entirely unreasonable, particularly as Roth had engaged in no criminal conduct, was not resisting, did not present a threat, and was only trying to verbally prevent a CCSO officer from harming another civilian. At no time did the CCSO officers attempt to de-escalate the situation or use alternatives to force, also in violation of CCSO policy.

217.    Even though the officers engaged in battery on a subdued person, no charges were sought. During the PRB investigation, the investigators failed to consider whether it was appropriate for the officers to use physical force in

response to a verbal disturbance. PRB investigators failed to consider whether Roth was already subdued when the Corporal deployed the taser. Investigators failed to consider prior allegations of excessive force and false reporting against the involved Corporal.

218.   The officers were exonerated in this matter and not disciplined. CCSO officials, including Chief Chris Roberts, Captain Mark Baker, and Lieutenant Richard Gibbons, signed off on the lack of discipline, immunizing the officers from accountability. Sheriff Rambosk was directly alerted of the charges and investigation; on information and belief, he also approved of the officers' exoneration.  The CCSO's failure to properly investigate or discipline officers in this matter violated CCSO policy.

## DAMAGES

219.   The Defendants' brutal misconduct caused severe consequences.

220.   Prior to his untimely death, Mr. Morales suffered severe physical and emotional pain and suffering, including by being physically mauled by a K-9 German Shepard, causing deep lacerations and muscle wounds on his body.

221.   As a result of the shooting, Nick Jr. was left an orphan, having lost the last member of his immediate family. With the death of his father, Nick Jr. has been denied the familial and monetary support, love, companionship, counsel, services, and guidance that he would have received from Mr. Morales had he not been wrongfully killed.

222. Nick Jr. has suffered extreme mental and emotional pain and suffering due to the Defendants' actions. The day after Mr. Morales' death, Nick Jr. was removed from school and detained for hours by CCSO officers, a deeply traumatic experience, particularly since he just learned that CCSO officers killed his father. After losing his father so prematurely, Nick Jr. had to move to Texas in order to reside with his guardian, his half-sister, in Texas. He was forced to leave his home, school, teachers, and friends and begin a new life born out of tragedy. Nick Jr. now has trouble sleeping, experiences depression and anxiety, and often has flashbacks and nightmares about his father's death.

223. Plaintiff Jesse Andrade, the personal representative of Mr. Morales, and acting on behalf of Nick Jr.'s interests, also incurred medical and funeral expenses as a result of Mr. Morales' death.

224. By their misconduct, the Defendants proximately caused all of these significant harms, for which the Estate seeks compensatory, punitive, and state law damages through this suit, and as set forth in the Counts below.

### Count I: EXCESSIVE FORCE
### (Fourth Amendment Claim Under 42 U.S.C. § 1983 against Defendant Officers Jean and Kirk in their Individual Capacities)

225. Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 224, above, and further alleges as follows.

226. Count I is alleged against Defendants JEAN and KIRK, in their individual capacities, who were at all times material hereto CCSO officers and

employees acting under color of state law and within the scope of their employment.

227.   On September 17, 2020, JEAN intentionally shot and killed MR. MORALES. Less than 30 seconds after arriving at the scene, JEAN fired his gun four times at MR. MORALES, hitting him three times in his body, even though MR. MORALES was not suspected of felonious conduct, was not resisting, was in a mental health crisis, and did not present a serious threat of harm to officers, civilians, or the general public.

228.   In shooting MR. MORALES, JEAN acted precipitously and without warning or justification, and with reckless indifference to MR. MORALES' constitutional rights. JEAN lacked probable cause to use such lethal force, which was grossly disproportionate to any possible threat posed by MR. MORALES.

229.   By shooting MR. MORALES multiple times, JEAN caused MR. MORALES grievous bodily injury, pain and suffering, and emotional distress. MR. MORALES ultimately died as a result of JEAN's unlawful shooting.

230.   No reasonable officer would have believed that shooting a lethal firearm in the circumstances alleged here was warranted or lawful.

231.   JEAN's conduct was thus objectively unreasonable and violated MR. MORALES' clearly-established rights under the Fourth Amendment to the United States Constitution, as incorporated against the states, to be free from excessive lethal force and unreasonable seizure.

232.   On September 17, 2020, KIRK intentionally released his K-9 German Shepherd and sicced him on MR. MORALES, precipitously and without warning, and after MR. MORALES had already been shot by JEAN. The dog mauled MR. MORALES, tearing his skin and muscle, and subjecting MR. MORALES to grievous bodily injury, pain and suffering, and emotional distress.

233.   In releasing the dog on MR. MORALES, KIRK acted precipitously and without warning or justification, and with reckless indifference for MR. MORALES' constitutional rights.

234.   At the time KIRK ordered the K-9 to attack MR. MORALES, MR. MORALES was not suspected of felonious conduct, was not resisting, was in a mental health crisis, and did not present a serious threat of harm to the officers, civilians, or to the general public. MR. MORALES had also been subdued on the ground by Jean's use of unlawful lethal force

235.   KIRK failed to remove the dog from MR. MORALES for a prolonged period of time, increasing the extreme pain, suffering, and emotional distress to MR. MORALES.

236.   No reasonable officer would have believed that releasing a lethal K-9 without warning in such circumstances was warranted or lawful. No reasonable officer would have believed that failing to immediately remove the dog from MR. MORALES after the unjustified attack was warranted or lawful.

237.    KIRK's conduct was thus objectively unreasonable and violated MR. MORALES' clearly-established rights under the Fourth Amendment to the United States Constitution, as incorporated against the states, to be free from excessive force and unreasonable seizure.

238.    The actions and omissions of JEAN and KIRK were the direct and proximate cause of the violations of MR. MORALES' clearly-established Fourth Amendment rights.

239.    Plaintiff seeks all available compensatory and punitive damages for JEAN and KIRK's constitutional violations, as set forth in paragraphs 219 to 224. These damages include the loss and enjoyment of MR. MORALES' life, as well as the severe bodily injury, pain and suffering, and emotional and mental distress MR. MORALES suffered prior to his death, and the losses suffered by his minor son, Nick Jr.

### Count II: FAILURE TO INTERVENE
### (Fourth Amendment Claim Under 42 U.S.C. § 1983 against Defendant Officers Jean, Kirk, and Tarazona in their Individual Capacities)

240.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 224, above, and further alleges as follows.

241.    Count II is alleged against Defendants JEAN, KIRK, and TARAZONA, in their individual capacities, who were at all times material hereto CCSO officers and employees acting under color of state law and within the scope of their employment.

242.   On September 17, 2020, KIRK and TARAZONA had the duty and opportunity to intervene on behalf of MR. MORALES, and to prevent JEAN from using excessive and objectively unreasonable lethal force in violation of MR. MORALES' clearly-established Fourth Amendment rights, but they failed to do so.

243.   In particular, the two Defendants did not attempt to stop Jean from shooting MR. MORALES despite the fact that MR. MORALES did not pose a serious threat of harm to any person, and even though it was evident that JEAN's actions at the scene were likely to lead to MR. MORALES' serious injury or death. TARAZONA and KIRK did not encourage JEAN to slow down or use less lethal force. They did not take any reasonable steps to protect MR. MORALES, even though they were next to JEAN at the scene and observed JEAN rapidly approach MR. MORALES with his firearm raised and poised to shoot.

244.   The conduct of KIRK and TARAZONA was the direct and proximate cause of the violations of MR. MORALES' constitutional rights. By their acts and omissions, they violated clearly-established law governing the duty to intervene to prevent the excessive use of force by another officer.

245.   On September 17, 2020, JEAN and TARAZONA had the opportunity and the duty to intervene on behalf of MR. MORALES to prevent KIRK from using excessive and objectively unreasonable canine force in violation of the Fourth Amendment, but they failed to do so. In particular, JEAN and TARAZONA were

present at the scene but failed to take reasonable steps to stop KIRK from releasing the K-9, including after MR. MORALES had already been shot by JEAN. Further, though MR. MORALES was lying prostrate on the ground crying in pain, JEAN and TARAZONA failed to attempt to remove the K-9 from MR. MORALES' body or encourage KIRK to retrieve the K-9 from MR. MORALES, thereby prolonging the attack and MR. MORALES' pain and suffering, and delaying the provision of emergency medical care to MR. MORALES.

246.    The conduct of JEAN and TARAZONA was the direct and proximate cause of the violations of MR. MORALES' constitutional rights. By their acts and omissions, they violated clearly-established law governing the duty to intervene to prevent the excessive use of force by another officer.

247.    In failing to intervene at the scene, KIRK, TARAZONA, and JEAN acted with reckless indifference to MR. MORALES' clearly-established Fourth Amendment rights to be free from excessive use of force by law enforcement.

248.    Plaintiff seeks all available compensatory and punitive damages for the failure to intervene by JEAN, KIRK, and TARAZONA, as set forth in paragraphs 219 to 224. These damages include the loss and enjoyment of MR. MORALES' life, as well as the severe bodily injury, pain and suffering, and emotional and mental distress MR. MORALES suffered prior to his death, and the losses suffered by his minor son, Nick Jr.

**Count III: UNLAWFUL PATTERN, PRACTICE, AND CUSTOM**
**(*Monell* Claim under 42 U.S.C. § 1983 against Defendant Sheriff Rambosk in**
**his Official Capacity for a Pattern and Practice of Excessive Force and Failures**
**of Accountability, and for Failure to Screen Defendant Officer Jean)**

249.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 224, above, and further alleges as follows.

250.    Count III is alleged against COLLIER COUNTY SHERIFF RAMBOSK, in his official capacity as the agency head of the CCSO, acting on behalf of COLLIER COUNTY.

251.    The CCSO, through its officers acting within the scope of their employment, has a pattern, practice, and custom of using unreasonable and disproportionate force against civilians. These acts of excessive force include unreasonable and unwarranted tasings, beatings, dog attacks, and shootings, of the kind that occurred in this case.

252.    The CCSO similarly has a related pattern, practice, and custom of failing to adequately investigate, charge, and hold its officers accountable for using such unreasonable and disproportionate force against civilians and for related policy violations.

253.    These policies, practices, and customs are interrelated, widespread, and well-known within the CCSO. RAMBOSK and senior leadership in the CCSO, including those within the CCSO Professional Responsibility Bureau, are alerted to all incidents in which their officers are alleged to have used excessive force. Yet

the CCSO, through RAMBOSK and CCSO leadership, systematically fails to adequately investigate, charge, and effectively discipline officers for such conduct. RAMBOSK and CCSO leadership approve and acquiesce in the misconduct of CCSO officers and perpetuate a culture of violence and impunity within the Sheriff's Office.

254.    By promoting, approving, and perpetuating these policies, practices, and customs, the CCSO, through RAMBOSK, have acted with deliberate indifference to the constitutional rights of civilians in Collier County, including MR. MORALES.  RAMBOSK and his leadership intentionally turned a blind eye to the serious risk that the CCSO's policies, practices, and customs of excessive force and failed accountability would lead to violations of civilians' Fourth Amendment rights, and in particular, the unlawful use of excessive lethal force.

255.    The CCSO's policies, practices, and customs of excessive force and failed accountability were the moving force behind the actions of the individual Defendant Officers as alleged in this Complaint. As a result of the CCSO's policies, practices, and customs described herein, the Defendant Officers knew that they could abuse their power by subjecting MR. MORALES to disproportionate and excessive force and by failing to intervene to prevent such excessive force, and that they would not be disciplined or in any way held to account for this misconduct.

256.    In this way, MR. MORALES' brutal shooting was an entirely foreseeable result of the CCSO's policies, practices and customs described herein.

60

These policies and practices were the direct and proximate cause of the violations of MR. MORALES' clearly-established constitutional rights, culminating in his death and giving rise to the damages suffered by MR. MORALES, his estate, and his minor son, as set forth in paragraphs 219 to 224.

257.    RAMBOSK, in his official capacity on behalf of COLLIER COUNTY, is separately liable for failing to adequately screen JEAN before promoting him to deputy sheriff.

258.    At all times material hereto, pursuant to CCSO policy, RAMBOSK had final authority over implementing CCSO rules and procedures governing the hiring, screening, supervision, discipline, retention, and promotion of CCSO officers.

259.    Prior to JEAN's promotion from correctional officer to law enforcement officer, RAMBOSK in his official capacity on behalf of COLLIER COUNTY and through other top-level CCSO officials, knew that JEAN was unqualified for the law enforcement position. Throughout his time in the Academy, JEAN repeatedly demonstrated ignorance of the laws and CCSO policies governing the use of deadly force, an inability to perform his duties under stressful conditions, a tendency to fabricate evidence, misreport events, and conceal the truth, and a propensity to engage in illegal and violent conduct, as set forth in paragraphs 118 to 137.

260.    Each of these deficiencies was known to and documented by RAMBOSK and top-level CCSO officials, who initially refused to promote JEAN to law enforcement officer based on his professional failings.

261.    The CCSO, through RAMBOSK and top-level CCSO officials, did not undertake any remedial action to address JEAN's glaring performance deficiencies, including by remediating JEAN's ignorance of the lethal force standard.

262.    Knowing that JEAN was wholly unqualified for the position, the CCSO did then promote JEAN, permitting him to respond as an armed officer to high-stress circumstances involving civilians in Collier County.

263.    Two years after failing the Academy and after being denied promotion based on the deficiencies described in this Count and the Complaint, JEAN unlawfully shot and killed MR. MORALES.

264.    JEAN's unlawful use of lethal force against a civilian was a plainly obvious consequence of the CCSO's inadequate screening. RAMBOSK and top-level CCSO officials knew or should have known that because of JEAN's professional deficiencies, in particular, his ignorance of the deadly force standard and his inability to respond to stressful law enforcement situations, he was highly likely to deprive civilians of their Fourth Amendment rights to be free from excessive force.

265.    In promoting and arming JEAN, the CCSO, through RAMBOSK and CCSO top officials, was deliberately indifferent to the risk that JEAN would violate civilians' Fourth Amendment rights, and specifically, the risk that he would use unlawful lethal force.

266.    The CCSO's deliberate indifference in screening JEAN for promotion was the moving force behind JEAN's violation of MR. MORALES' Fourth Amendment right to be free from excessive lethal force.

267.    Plaintiff seeks all available compensatory damages against RAMBOSK, as set forth in paragraphs 219 to 224. These damages include the loss and enjoyment of MR. MORALES' life, as well as the severe bodily injury, pain and suffering, and emotional and mental distress MR. MORALES suffered prior to his death, and the losses suffered by his minor son, Nick Jr.

### Count IV: WRONGFUL DEATH STATE LAW CLAIM
**(Wrongful Death Act Claim under Fla. Stat. Ann. § 768.16 *et. seq.* against Defendant Officer Jean in his Individual Capacity)**

268.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 224, above, and further alleges as follows.

269.    Count IV is alleged against Defendant JEAN, in his individual capacity, who was at all times material hereto a CCSO officer and employee acting under color of state law and within the scope of his employment.

270.    In the course of responding to a 911 call on September 17, 2020, in Immokalee, Florida, JEAN committed the intentional tort of battery on MR.

MORALES. Less than 30 seconds after arriving at the scene, JEAN shot at MR. MORALES four times, striking his body in three places. JEAN intended to cause this harmful contact with MR. MORALES' person.

271.    JEAN's use of force was excessive and unreasonable under the circumstances. MR. MORALES was not suspected of felonious conduct, was not resisting, was in a mental health crisis, and did not present a serious threat of harm to officers, civilians, or the general public.

272.    JEAN acted in a manner exhibiting wanton and willful disregard of MR. MORALES' human rights and safety. JEAN knew or reasonably should have known that his excessive and lethal use of force, which included fatally shooting an unthreatening man from close range and without warning, violated MR. MORALES' rights and his safety, yet he disregarded the foreseeable consequences of that conduct. Thus, he is not entitled to immunity under Fla. Stat. Ann. § 768.28.

273.    As a direct and proximate result of JEAN's battery, MR. MORALES suffered grievous bodily injury, physical pain and suffering, emotional distress, and ultimately, the loss of his life.

274.    As a direct and proximate result of the acts and omissions set forth in this Count, Plaintiff, as Personal Representative of the Estate of Nicolas Morales, acting on behalf of MR. MORALES' minor son, Nicolas Morales Jr., sustained serious damages, as set forth in paragraphs 219 to 224. These damages include, without limitation, past and future mental pain and suffering; the loss of the care,

support, comfort, society and services, maintenance, companionship, instruction, guidance, advice, counsel, inheritance, and other reasonable contributions of pecuniary and non-pecuniary value that Nick Jr., as MR. MORALES' minor son and heir, would have otherwise received during his father's life had it not been for MR. MORALES' untimely, tragic, and wrongful death; expenses stemming from medical care and funeral arrangements arising from the injury and death of MR. MORALES; the loss of the estate's prospective net accumulations; and the loss of an inheritable estate. By this Count, Plaintiff seeks all available compensatory and punitive damages recoverable under Florida state law, including Fla. Stat. Ann. § 768.21 and § 768.72 *et. seq.*

### Count V: WRONGFUL DEATH STATE LAW CLAIM
### (Wrongful Death Act Claim under Fla. Stat. Ann. § 768.16 *et. seq.* against Defendant Sheriff Rambosk in his Official Capacity)

275.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 224, above, and further alleges as follows.

276.    Pursuant to Fla. Stat. Ann. § 768.28(6), Plaintiff has presented this claim in writing to COLLIER COUNTY and to the CCSO, neither of which made a final disposition of the claim within 90 days of receipt. That failure is deemed a denial for purposes of the applicable statute.

277.    All conditions precedent to the bringing and maintenance of this action have been satisfied, performed, or waived, including compliance with the notice requirements set by Fla. Stat. Ann. § 768.28(6).

278.    Count V is alleged against COLLIER COUNTY SHERIFF RAMBOSK, in his official capacity on behalf of COLLIER COUNTY, under Florida law, Fla. Stat. Ann. § 768.28(9), which holds a government entity vicariously liable for personal injury and death caused by negligent or wrongful acts or omissions of its employees and agents acting within the course and scope of their employment and/or office, as well as for its own negligent conduct.

279.    Accordingly, RAMBOSK, in his official capacity on behalf of COLLIER COUNTY, is vicariously liable for JEAN's intentional battery, as set forth in Count IV.

280.    On September 17, 2020, JEAN was acting within the course and scope of his employment with the CCSO when he intentionally subjected MR. MORALES to excessive and unreasonable force, which resulted in MR. MORALES' pain and suffering, and thereafter, his untimely death.

281.    Count V is also alleged against RAMBOSK, in his official capacity on behalf of COLLIER COUNTY, for his negligent failure to adequately screen, retain, and supervise JEAN, including for the negligent decision to promote JEAN to law enforcement officer, conduct for which COLLIER COUNTY is directly liable.

282.    When the CCSO responded to the scene of the 911 call on September 17, 2020, and attempted to seize MR. MORALES, RAMBOSK, in his official capacity on behalf of COLLIER COUNTY, owed Mr. Morales a specific duty of reasonable care. As a result of RAMBOSK's and COLLIER COUNTY's failure to

adequately screen, retain, and supervise JEAN, the CCSO breached that duty of care owed to MR. MORALES.

283.    In particular, based on JEAN's training results and job performance, COLLIER COUNTY and RAMBOSK knew or should have known that JEAN was incompetent, deficient in his law enforcement training and knowledge, particularly as to use of force, and likely to physically harm or use unlawful force against civilians in Collier County, Florida, when acting within the scope of his employment.

284.    The CCSO, including Rambosk and other top officials, had documented evidence of JEAN's deficiencies during his time in the Academy and throughout his employment with the CCSO. These deficiencies included JEAN's repeated inability to identify or articulate the proper standard for the use of lethal force, his history of violence against a civilian, his inability to complete basic law enforcement tasks or operate under stress conditions, his faulty report writing, and his history of mishandling evidence.

285.    Each substantive deficiency was known to and reported by top-level CCSO officials, who initially refused to promote JEAN based on these professional failings.

286.    Despite JEAN's troubling work history, the CCSO failed to ameliorate JEAN's deficiencies or terminate him from the CCSO as a result of his misconduct

and poor performance. Instead, the CCSO promoted JEAN to law enforcement officer, permitting him to patrol the streets with a gun.

287.   In doing so, RAMBOSK and COLLIER COUNTY violated and failed to properly implement the CCSO's own policies governing the proper screening, retention, and supervision of law enforcement officers. Had RAMBOSK properly implemented the CCSO's own policies, JEAN would not have been promoted to law enforcement officer and would not have encountered MR. MORALES on September 17, 2020.

288.   As a result of RAMBOSK and COLLIER COUNTY's negligent conduct, JEAN was permitted to use unlawful lethal force, which was the direct and proximate cause of MR. MORALES' tragic death.

289.   RAMBOSK and COLLIER COUNTY's failure to adequately screen, retain, and supervise JEAN in accordance with CCSO procedures were operational rather than discretionary law enforcement tasks, for which COLLIER COUNTY is not entitled to sovereign immunity under Florida law.

290.   As a direct and proximate result of the acts and omissions set forth in this Count, Plaintiff, as Personal Representative of the Estate of Nicolas Morales, acting on behalf of MR. MORALES' minor son, Nicolas Morales Jr., sustained serious damages, as set forth in paragraphs 219 to 224. These damages include, without limitation, past and future mental pain and suffering; the loss of the care, support, comfort, society and services, maintenance, companionship, instruction,

guidance, advice, counsel, inheritance, and other reasonable contributions of pecuniary and non-pecuniary value that Nick Jr., as MR. MORALES' minor son and heir, would have otherwise received during his father's life had it not been for MR. MORALES' untimely, tragic, and wrongful death; expenses stemming from medical care and funeral arrangements arising from the injury and death of MR. MORALES; the loss of the estate's prospective net accumulations; and the loss of an inheritable estate. In this action, Plaintiff seeks all available compensatory recoverable under Florida state law, including Fla. Stat. Ann. § 768.21 and § 768.81.

## Count VI: BATTERY STATE LAW CLAIM
### (Survivor Action under Fla. Stat. Ann. § 46.021 against Defendant Officer Kirk in his Individual Capacity)

291.    Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 224, above, and further alleges as follows.

292.    Count VI is alleged against Defendant KIRK, in his individual capacity, who was at all times material hereto a CCSO officer and employee acting under color of state law and within the scope of his employment.

293.    In the course of responding to a 911 call on September 17, 2020, in Immokalee, Florida, KIRK committed the intentional tort of battery on MR. MORALES. KIRK released his lethal German Shepherd K-9 on MR. MORALES and the K-9 mauled MR. MORALES, penetrating MR. MORALES' upper body and tearing his shoulder muscle. KIRK intended to cause this harmful contact with MR. MORALES' person.

294.    KIRK's use of force was excessive and unreasonable under the circumstances. KIRK released the K-9 even though MR. MORALES was not suspected of felonious conduct, was not resisting, was in a mental health crisis, and did not present a serious threat of harm to officers, civilians, or the general public. KIRK did not immediately recall, retrieve, or attempt to remove the K-9 from MR. MORALES' body, compounding his physical injuries.

295.    KIRK acted in a manner exhibiting wanton and willful disregard of MR. MORALES' human rights and safety. KIRK knew or reasonably should have known that unleashing a police K-9 without warning on an unthreatening man and failing to even attempt to retrieve the dog as it continued to maul him violated MR. MORALES' rights and his safety, yet Kirk disregarded the foreseeable consequences of that conduct. Thus, he is not entitled to immunity under Fla. Stat. Ann. § 768.28.

296.    As a direct and proximate result of KIRK's intentional battery, MR. MORALES incurred serious damages in the period prior to his unlawful death, including grievous bodily injury, physical pain and suffering, and emotional distress. By this Count, Plaintiff seeks all available compensatory and punitive damages recoverable under Florida state law, including Fla. Stat. Ann. § 46.021 and § 768.72 *et. seq.*

**Count VII: BATTERY STATE LAW CLAIM**
**(Survivor Action under Fla. Stat. Ann. § 46.021 against**
**Defendant Sheriff Rambosk in his Official Capacity)**

297.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 224, above, and further alleges as follows.

298.  Pursuant to Fla. Stat. Ann. § 768.28(6), Plaintiff has presented this claim in writing to COLLIER COUNTY and to the CCSO, neither of which made a final disposition of the claim within 90 days of receipt. That failure is deemed a denial for purposes of the applicable statute.

299.  All conditions precedent to the bringing and maintenance of this action have been satisfied, performed, or waived, including compliance with the notice requirements set by Fla. Stat. Ann. § 768.28(6).

300.  Count VII is alleged against RAMBOSK, in his official capacity on behalf of COLLIER COUNTY under Florida law, Fla. Stat. Ann. § 768.28(9), which holds a government entity vicariously liable for personal injury caused by negligent or wrongful acts or omissions of its employees and agents acting within the course and scope of their employment and/or office.

301.  RAMBOSK, in his official capacity on behalf of COLLIER COUNTY, is vicariously liable for KIRK's intentional battery.

302.  On September 17, 2020, Defendant KIRK was acting within the course and scope of his employment with the CCSO when he responded to the scene of a 911 call in Immokalee, Florida, where he encountered MR. MORALES.

303.   At the scene, KIRK committed the tort of battery on MR. MORALES by intentionally and unreasonably releasing his German Shepherd K-9 on MR. MORALES without justification. KIRK did not immediately recall, retrieve, or attempt to remove the K-9 dog from MR. MORALES' body, resulting in him being mauled for over a minute and compounding his physical injuries.

304.   As a direct and proximate result of KIRK's intentional battery, MR. MORALES incurred serious damages in the period prior to his unlawful death, including grievous bodily injury, physical pain and suffering, and emotional distress. By this Count, Plaintiff seeks all available compensatory damages recoverable under Florida state law, including Fla. Stat. Ann. § 46.021.

**Count VIII: IIED STATE LAW CLAIM**
**(Survivor Action under Fla. Stat. Ann. § 46.021 against**
**Defendant Officers Jean and Kirk in their Individual Capacities)**

305.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 224, above, and further alleges as follows.

306.   Count VIII is alleged against Defendants JEAN and KIRK, in their individual capacities, who were at all times material hereto CCSO officers and employees acting under color of state law and within the scope of their employment.

307.   The acts and omissions of JEAN, including his intentional use of a firearm to shoot at MR. MORALES four times from close range and without warning, despite the fact that MR. MORALES was not suspected of felonious

conduct, was not resisting, was in a mental health crisis, and did not present a serious threat of harm to officers, civilians, or the general public, as set forth in Count IV, were extreme, outrageous, and extended beyond all bounds of human decency.

308.   The acts and omissions of KIRK, including his intentional use of a K-9 German Shepherd to maul and physically injure MR. MORALES after he had already been shot, and KIRK's deliberate failure to recall or retrieve the K-9 as it inflicted severe pain and suffering upon MR. MORALES, as set forth in Count VI, were also extreme, outrageous, and extended beyond all bounds of human decency.

309.   JEAN and KIRK's violent acts were rooted in an abuse of their law enforcement authority and were undertaken purposefully and in reckless disregard of the likelihood that their conduct would cause severe emotional distress to MR. MORALES.

310.   JEAN and KIRK acted in a manner exhibiting wanton and willful disregard of MR. MORALES' human rights and safety. They knew or reasonably should have known that these acts and omissions violated MR. MORALES' rights and his safety, yet they disregarded the foreseeable consequences of their conduct. Thus, they are not entitled to immunity under Fla. Stat. Ann. § 768.28.

311.   As a direct and proximate result of JEAN and KIRK's deliberate acts and omissions, MR. MORALES suffered severe emotional distress in the last

moments of his life. By this Count, Plaintiff seeks all available compensatory and punitive damages recoverable under Florida state law, including Fla. Stat. Ann. § 46.021 and § 768.72 *et. seq.*

### Count IX: NEGLIGENCE STATE LAW CLAIM
### (Survivor Action under Fla. Stat. Ann. § 46.021 against
### Defendant Sheriff Rambosk in his Official Capacity)

312.   Plaintiff incorporates by reference the allegations contained in paragraphs 1 to 224, above, and further alleges as follows.

313.   Pursuant to Fla. Stat. Ann. § 768.28(6), Plaintiff has presented this claim in writing to COLLIER COUNTY and to the CCSO, neither of which made a final disposition of the claim within 90 days of receipt. That failure is deemed a denial for purposes of the applicable statute.

314.   All conditions precedent to the bringing and maintenance of this action have been satisfied, performed, or waived, including compliance with the notice requirements set by Fla. Stat. Ann. § 768.28(6).

315.   Count IX is alleged against COLLIER COUNTY SHERIFF RAMBOSK, in his official capacity on behalf of COLLIER COUNTY, under Florida law, Fla. Stat. Ann. § 768.28(9), which holds a government entity vicariously liable for personal injury caused by negligent or wrongful acts or omissions of its employees and agents acting within the course and scope of their employment and/or office.

316.   In the course of responding to a 911 call on September 17, 2020, in Immokalee, Florida, Defendants KIRK and TARAZONA sought to detain or arrest MR. MORALES, putting MR. MORALES in a foreseeable zone of risk.

317.   KIRK owed MR. MORALES a duty of reasonable care in handling his K-9 while carrying out these law enforcement operations. KIRK breached that duty in improperly deciding to use his K-9 at the scene and in his mishandling of that K-9. By his conduct, KIRK failed to adhere to accepted law enforcement standards and practices, including those of the CCSO, for the use and handling of K-9s on civilian subjects. Because KIRK failed to take reasonable care where such care was demanded, his conduct was negligent. By his negligence, KIRK caused MR. MORALES' pain and suffering.

318.   At the scene, TARAZONA breached his duty of reasonable care to MR. MORALES by failing to intervene to prevent or stop JEAN from shooting MR. MORALES and KIRK from releasing the K-9. TARAZONA also breached his duty by failing to immediately attempt to remove the dog from MR. MORALES or encourage KIRK to do so. By his conduct, TARAZONA failed to adhere to accepted law enforcement standards and practices, including those of the CCSO, governing the duty to intervene. Because TARAZONA failed to take reasonable care where such care was demanded, his conduct was negligent. By his negligence, TARAZONA caused MR. MORALES' pain and suffering.

319.    Moreover, due to KIRK's improper release and handling of the K-9, as well as TARAZONA's failure to intervene, the K-9 attacked and mauled MR. MORALES for over a minute, causing a physical impact that led MR. MORALES to suffer severe emotional distress.

320.    RAMBOSK, in his official capacity on behalf of COLLIER COUNTY, is vicariously liable for KIRK's negligent handling and decision to use his K-9, for TARAZONA's negligent failure to intervene to prevent or stop the shooting and dog attack on MR. MORALES, and for KIRK and TARAZONA's negligent infliction of emotional distress on MR. MORALES.

321.    As a direct and proximate result of KIRK's and TARAZONA's negligence, for which the Sheriff is vicariously liable, MR. MORALES was mauled for over a minute, and his skin and muscle were severely lacerated, causing MR. MORALES grievous bodily harm, physical pain and suffering, and emotional distress. By this Count, Plaintiff seeks all available compensatory damages recoverable under Florida state law, including Fla. Stat. Ann. § 46.021 and § 768.81.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against all Defendants, awarding compensatory damages, costs, and attorneys' fees as provided for by 42 U.S.C. § 1988 and by Florida state law, as well as punitive damages against each of the individual Defendants, and such further additional relief as this Court may deem appropriate and just.

## DEMAND FOR A JURY TRIAL

Plaintiff demands trial by jury.

Dated: August 10, 2022

Respectfully submitted,

**ESTATE OF NICOLAS MORALES by JESSE ANDRADE**

By: /s/ Chris Lomax
  One of Plaintiff's attorneys

Chris Lomax (Fla Bar No. 56220) (Lead counsel)
***Lomax Legal***
95 Merrick Way, 3rd Floor
Coral Gables, FL 33134
(305) 582-6506
chris@lomaxlegal.com

Alexa Van Brunt (pending special admission *pro hac vice*)
Noor Tarabishy (same)
Danielle Berkowsky (same)
***Roderick and Solange MacArthur Justice Center***
Northwestern Pritzker School of Law
375 E. Chicago Avenue, 8th floor
Chicago, IL 60647
(312) 503-1336
alexa.vanbrunt@macarthurjustice.org

Brent Probinksy (Fla Bar No. 357936)
***Probinsky & Cole***
3414 Magic Oak Lane
Sarasota, FL 34232
(941) 371-8800
b.probinsky@probinskylaw.com

**COUNSEL FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on August 10, 2022, a true and correct copy of this Complaint was filed with the Clerk of Court through the CM/ECF system.

<u>/s/ Chris Lomax</u>